# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Tanisha Sherri Scott,                                    Civ. No. 16-3159 (DSD/BRT)

        Plaintiff,

v.

Nancy A. Berryhill,                                      **REPORT AND**
Acting Commissioner of                                   **RECOMMENDATION**
Social Security,

        Defendant.

---

James H. Greeman, Esq., Greeman Toomey PLLC, counsel for Plaintiff.

Ann M. Bildtsen, Esq., United States Attorney's Office, counsel for Defendant.

---

BECKY R. THORSON, United States Magistrate Judge.

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Tanisha Scott seeks judicial review of the final determination of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits. This matter is before the Court on the parties' cross-motions for summary judgment, in accordance with D. Minn. LR 7.2(c)(1). (Doc. Nos. 14, 17.) For the reasons stated below, the Court recommends that Plaintiff's Motion for Summary Judgment be denied and Defendant's Motion for Summary Judgment be granted.

# BACKGROUND

## I.    Procedural History

Plaintiff applied for Title II disability insurance benefits ("DIB") on June 24, 2013, alleging a disability onset date of April 6, 2010. (Tr. 196.)[1] The Social Security Administration ("SSA") denied Plaintiff's application on November 22, 2013, and again after reconsideration on April 10, 2014. (Tr. 105, 110.) At Plaintiff's request, a hearing was held before an Administrative Law Judge ("ALJ") on April 24, 2015. (Tr. 27, 113–15.) The ALJ denied Plaintiff's application on July 31, 2015, and the Social Security Appeals Council denied her request for review on July 22, 2016. (Tr. 10–12, 1–4, 7–9.) The Appeals Council's denial of review made the ALJ's decision the final decision of the Commissioner. 20 C.F.R. § 404.981.

On September 23, 2016, Plaintiff filed this action seeking judicial review pursuant to 42 U.S.C. § 405(g). (Doc. No. 1.) On December 8, 2016, Defendant filed an Answer along with a certified copy of the administrative record. (Doc. Nos. 11, 12.) The parties have now filed cross-motions for summary judgment pursuant to the Local Rules. (Doc. Nos. 14, 17.) In her motion, Plaintiff alleges three errors made by the ALJ. First, Plaintiff argues that the ALJ failed to assign appropriate weight to the treating physician's opinion as required by 20 C.F.R. § 404.1527(c)(2) and Eighth Circuit precedent. (Doc. No. 14, Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") 12–13.) Second, she argues that the ALJ erred in giving the state agency providers' opinions substantial weight. (*Id.* at 20, 22.)

---

[1]    Throughout this Report and Recommendation, the abbreviation "Tr." is used to reference the Administrative Record (Doc. No. 12).

Third, Plaintiff generally argues the ALJ's decision is not supported by substantial evidence. (*Id.* at 22.) Defendant disagrees and requests that the Court affirm the Commissioner's decision because the ALJ properly weighed the medical evidence. (Doc. No. 18, Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") 1.)

## II. Factual Background

In early 2010, Plaintiff sought mental health treatment while she was pregnant with her son. (Tr. 274.) She learned during her pregnancy that her son would not survive a fetal abnormality. (Tr. 256.) The psychiatrist she saw diagnosed her with adjustment disorder with depressed and anxious mood. (Tr. 275.) Her son was born on April 2, 2010, and died four days later on April 6, 2010.[2] (Tr. 326, 372.) Plaintiff was twenty-eight years old[3] on April 6, 2010, her alleged disability onset date. (Tr. 167.)

In 2012, Plaintiff was diagnosed with major recurrent depression, post-traumatic stress disorder, complicated bereavement, and persistent disorder of initiating or maintaining sleep. (Tr. 683.) At the hearing, before the ALJ, Plaintiff testified that her depression symptoms include body aches, exhaustion, inability to sleep, and a lack of appetite. (Tr. 42.) She also testified that she has anxiety attacks and difficulty focusing.

---

[2]     At the time of her son's death, Plaintiff had a seven-year-old daughter. (Tr. 274.) Approximately ten months later, Plaintiff gave birth to another daughter on February 2, 2011. (Tr. 458.) In early 2012, Plaintiff became pregnant again; however, she had a miscarriage sometime between March and mid-April 2012. (Tr. 580, 586.) Plaintiff had a tubal ligation procedure in October 2012. (Tr. 627–28.)

[3]     Plaintiff incorrectly stated she was twenty-seven years old at the time of her alleged onset date.

(Tr. 44–45.) She testified that she has crying spells a few times per week. (Tr. 43.) Although she used to be very outgoing, she noted she is now short-tempered and avoids spending time with people. (Tr. 44.)

Plaintiff also testified that she takes care of her four-year-old and thirteen-year-old daughters. (Tr. 46.) She also attended college; she testified that she was failing, however, the records show she had a grade point average of 2.85 with no indication she is on academic probation or at risk of expulsion. (Tr. 35, 240.) While her daughters are at school, she lies in bed and plays on her phone or sometimes tries to do homework. (Tr. 46.) She testified that her mother-in-law helps her with the laundry and grocery-shopping because she gets tired. (Tr. 47–48.) She also stated she cooks and does dishes sometimes. (Tr. 47–48.)

Plaintiff has held a variety of jobs since 1996, including work as a cashier, waitress, assembler, and most recently, a team member at a fast food restaurant. (Tr. 231.) Before her alleged onset date, Plaintiff had worked most recently as a crew member at a medical supply assembly company from 2003 to 2008.[4] (Tr. 201.) She also worked part-time at a fast food restaurant after her alleged onset date from October 2011 to March 2012. (Tr. 36, 201.) Plaintiff testified that she left her most recent position at the restaurant for medical reasons. (Tr. 40.) She stated she became too overwhelmed and felt "emotionally drained and tired and frustrated." (Tr. 40–41.)

---

[4]     It is unclear from the record why Plaintiff stopped working at the medical supply assembly company.

### III.    The ALJ's Findings and Decision

In his decision dated July 31, 2015, the ALJ found that Plaintiff was not disabled as defined by the Social Security Act and denied Plaintiff's application for DIB. (Tr. 21.) The ALJ proceeded through the five-step evaluation process provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)(4). The steps are as follows: (1) whether the claimant is presently engaged in "substantial gainful activity"; (2) whether the claimant is severely impaired; (3) whether the impairment meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant can perform past relevant work; and, if not (5) whether the claimant can perform other jobs available in sufficient numbers in the national economy. *Id.* § 404.1520(a)–(f).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of April 6, 2010, through her date last insured[5] of March 31, 2014. (Tr. 15.) At step two, the ALJ found that Plaintiff had the following severe combination of impairments: "A major depressive disorder; an anxiety disorder with insomnia; posttraumatic stress disorder; complicated bereavement; and a personality disorder." (Tr. 15.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15–16.) The ALJ considered listings for mental impairments. (Tr. 16–17.)

---

[5]    *See Fishbaugher v. Astrue*, 878 F. Supp. 2d 939, 942 n.2 (D. Minn. 2012) ("A claimant has to establish 'the existence of a disability on or before the date that the insurance coverage expires.'") (quoting *Basinger v. Heckler*, 725 F.2d 1166, 1168 (8th Cir. 1984)).

Before reaching step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform "a full range of work at all exertional levels but with the following nonexertional limitations." (Tr. 17.) The ALJ then limited Plaintiff to simple, routine, and repetitive tasks consistent with unskilled work and a work environment that included only occasional decision making. (Tr. 17.) The ALJ stated he made these findings after considering all of the Plaintiff's symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. (Tr. 18.) With regard to opinion evidence, the ALJ gave the opinion of the state agency psychological consultant substantial weight, and gave the opinion of Dr. Benson—Plaintiff's treating psychiatrist—moderate weight. (Tr. 19.)

At step four, the ALJ found that Plaintiff was not able to perform past relevant work as a catheter assembler. He based his step-four finding on the vocational expert's testimony that "the demands of the claimant's past work exceed the limitations in the RFC assessment." (Tr. 20.) Although Plaintiff carried out her past work as a catheter assembler at a "sedentary exertional level," the ALJ found that she could not perform this work. (Tr. 20.)

The ALJ continued to step five and found, pursuant to the vocational expert's testimony, that Plaintiff could make a "successful adjustment to other work that existed in significant numbers in the national economy" in light of Plaintiff's age, education, work experience, and RFC. (Tr. 21.) He found that Plaintiff could perform work as a rack room worker, laundry aide, and stuffer. (Tr. 21.) Thus, the ALJ concluded at step five that Plaintiff was not disabled under the Social Security Act. (Tr. 21.)

## DISCUSSION

### I.    Standard of Review

Congress has established the standards by which social security disability insurance benefits may be awarded. The SSA must find a claimant to be disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairments must be "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Statements about pain or other symptoms "will not alone establish" disability; instead, "there must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a).

The claimant bears the burden of proving that she is entitled to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a). Once the claimant has demonstrated that she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the [RFC] to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted).

The Court has the authority to review the Commissioner's final decision denying disability benefits to Plaintiff. 42 U.S.C. § 405(g). If the Commissioner's decision is supported by substantial evidence in the record as a whole, then the decision will be upheld. 42 U.S.C. § 405(g); *Kluesner*, 607 F.3d 533, 536 (citations omitted). "[T]he substantiality of the evidence must take into account whatever fairly detracts from its weight, and the notable distinction between 'substantial evidence,' and 'substantial evidence on the record as a whole,' must be observed." *Bauer v. Soc. Sec. Admin.*, 734 F. Supp. 2d 773, 799 (D. Minn. 2010) (citations omitted). This test requires "more than a mere search of the record for evidence supporting the Secretary's findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).

If, after review, the record as a whole supports the Commissioner's findings, the Commissioner's decision must be upheld, even if the record also supports the opposite conclusion. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The Court may not substitute its own opinion for that of the ALJ's, even if the Court would have reached a conclusion different from that of the factfinder. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

## II.    Analysis of the ALJ's Decision

Plaintiff argues that the ALJ erred in (1) failing to assign appropriate weight to the opinion of her treating physician, Dr. Corby Benson; (2) giving the state agency providers' opinions substantial weight; and (3) reaching a decision not supported by substantial evidence. (Pl.'s Mem. 12–13.) The Commissioner argues that the ALJ properly weighed the medical and other evidence in its decision that the Plaintiff was not

8

disabled. (Def.'s Mem. 1–2.) Therefore, the Commissioner asserts the ALJ's decision should be affirmed. (*Id.*)

## A. ALJ's Consideration of Dr. Benson's Opinion

Dr. Corby Benson is Plaintiff's treating psychiatrist. Plaintiff saw Dr. Benson six times between June 2013 and February 2015 for mental health concerns. (Tr. 700–04, 720–23, 726–29, 730–33, 762–65, 766–70.) Dr. Benson completed a Medical Source Statement regarding Plaintiff's ability to do work-related activities on March 24, 2015. (Tr. 771–74.)

In his statement, Dr. Benson noted that Plaintiff was very severely limited in her ability to initiate and complete routine tasks in a reasonable time frame. (Tr. 772.) He concluded that Plaintiff had poor to no mental ability to concentrate, understand, and remember simple instructions, carry out routine tasks to meet simple production quotas, maintain attention and focus for two-hour segments, perform activities within a schedule, and regularly attend work. (Tr. 772.) He also indicated that Plaintiff had poor to no ability to complete a normal work-day and work-week without interruptions from psychologically-based symptoms, cope with brief contact with coworkers and the public, accept and respond appropriately to supervisor feedback, deal with normal work-related stress, and adapt to changes in a routine work setting. (Tr. 773.) In addition, Dr. Benson concluded that Plaintiff's disorder causes more than a minimal limitation on ability to do unskilled work and that minimal increases in mental demands or stress will likely cause decompensation or a loss of stability. (Tr. 773.)

9

The ALJ gave Dr. Benson's opinion "no more than moderate weight" (Tr. 19), and with respect to Plaintiff's RFC, limited Plaintiff to unskilled work with only occasional decision making, change, and interactions with the public, co-workers, and supervisors. (Tr. 17.) Plaintiff argues that the ALJ's reasons for giving Dr. Benson's opinion less weight than the state agency psychologists' opinions are "not supported by the evidence on the record." (Pl.'s Mem. 20.) In particular, Plaintiff contends that Dr. Benson's opinion is "entitled to controlling weight." (Pl.'s Mem. 12.)

A treating physician's opinion on the nature and severity of impairments is entitled to controlling weight, but only when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404. 1527(c)(2). If the treating source's medical opinion is not afforded controlling weight, the factors considered in determining the weight to give the opinion are: (1) length of treatment relationship and frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability of the physician's assessment compared to the record; (4) consistency of the physician's assessment with the record; (5) specialization(s) of the physician; and (6) other factors. *Id.* § 404.1527(c)(2)–(6). "An ALJ may discount a treating source opinion that is unsupported by treatment notes." *Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016) (internal citation omitted). And the ALJ may give a treating physician's opinion less deference when it is based on subjective complaints rather than objective medical evidence. *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) (citation omitted).

Whether the ALJ gives the opinion of a treating physician great or little weight, the ALJ

must give good reasons for doing so. *Id.*

In his decision, the ALJ stated the following when weighing Dr. Benson's

assessment:

> The undersigned notes that Dr. Benson's assessment was authored after the date last insured, and it does not specify how long he believes the claimant's symptoms have existed at that level of severity. Additionally, many of the symptoms listed in Dr. Benson's assessment were not included in treatment notes during the relevant period.[6] Although Dr. Benson is a treating source, the claimant's testimony indicates she sees him only four times a year on average. Furthermore, the assessment fails to mention the numerous references to medication noncompliance on the part of the claimant. Her counselor has indicated that there is no clear reason for the claimant's failure to remain compliant, especially in light of her reported improvement with medication treatment.

(Tr. 19.)

This Court concludes that the ALJ did not err in giving "no more than moderate

weight" to the findings and opinions provided by Dr. Benson. (Tr. 19.) First, the ALJ

properly discounted Dr. Benson's opinion because it did not take Plaintiff's

noncompliance into account. "[A] claimant's noncompliance can constitute evidence that

is inconsistent with a treating physician's medical opinion and, therefore, can be

considered in determining whether to give that opinion controlling weight." *Owen v.

Astrue*, 551 F.3d 792, 800 (8th Cir. 2008). This is because "[i]f an impairment can be

controlled by treatment or medication, it cannot be considered disabling." *Brown v.*

---

[6]    Since the reasons discussed below are sufficient to support the ALJ's decision to give only moderate weight to Dr. Benson's opinion, this Court does not further discuss whether "symptoms listed in Dr. Benson's assessment were not included in treatment notes during the relevant period."

*Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004). Multiple visit reports authored by

Dr. Benson reference Plaintiff's decisions to discontinue taking her prescribed

medications. (Tr. 721, 726, 762, 767.) For example, on May 24, 2014, Dr. Benson noted

that Plaintiff had been "off her psychiatric medication for 2 weeks." (Tr. 762.) Later, on

February 18, 2015, he noted that Plaintiff had last complied with coming to the clinic

over nine months ago and had been off her psychiatric medication for more than a

month.[7] (Tr. 767.) Dr. Benson's treatment records also indicate that Plaintiff was

"warned that not taking an antidepressant can increase risk of depression and anxiety."

(Tr. 722.)

     Although Plaintiff had PHQ–9[8] scores ranging from seven to nineteen, which on

the high end generally reflects moderate subjective feelings of depression (Tr. 721, 726,

731, 763, 768), Plaintiff acknowledged "increased depression and anxiety while off her

---

[7]     In addition to not being medication compliant, Plaintiff also failed to get the lab work done that was ordered for her during her previous visit in May 2014. (Tr. 767.)

[8]     As explained in *Ramo v. Colvin*:

> [t]he Patient Health Questionnaire, PHQ–9, is used to screen, diagnose, monitor, and measure the severity of depression. Center for Quality Assessment and Improvement in Mental Health, available at http://www.cqaimh.org/pdf/tool_phq9.pdf. Scores of 15–19 indicate moderately severe major depression that warrants treatment with an antidepressant or psychotherapy. *Id.* Scores of 20 and greater indicate severe major depression that warrants treatment with an antidepressant and psychotherapy. *Id.* The highest possible score is 27, if the individual has endorsed all nine categories of symptoms occurring nearly every day. *Id.*

*Ramo v. Colvin*, No. 13–1233, 2014 WL 896729, at *5 n. 12 (D. Minn. Mar. 6, 2014).

psychiatric medications." (Tr. 767.) In addition, Dr. Benson's treatment notes show that Plaintiff's symptoms improved when she took her medications and worsened when she decided to stop taking them. (Tr. 721–22, 726–27.) Plaintiff stated two reasons for stopping her medication during the time Dr. Benson treated her: two of the medications caused fatigue and she sometimes forgot. (Tr. 720, 721, 731.) In her most recent visits with Dr. Benson, however, Plaintiff had "no stated reason" for stopping medication, despite his warnings that failing to take her medications would lead to worsened symptoms. (Tr. 726, 762, 767.) Dr. Benson's Medical Source Statement regarding Plaintiff's ability to do work-related activities on March 24, 2015 made no mention of Plaintiff's history of medication noncompliance. While it may have been an accurate snapshot of Plaintiff's condition in March 2015, the ALJ did not err in discounting Dr. Benson's opinion for the purpose of determining disability during the relevant time period because the statement failed to account for unjustified medication compliance. *See Wildman v. Astrue*, 596 F.3d 959, 964, 966 (8th Cir. 2010) (concluding "the ALJ properly discounted [the treating physician's] opinion because it did not take [the plaintiff's] noncompliance into account").[9]

Plaintiff argues that the ALJ relied too heavily on portions of the record where she demonstrated less severe symptoms. (Pl.'s Mem. 14.) She draws a comparison between the ALJ here and the ALJ in *Hutsell v. Massanari*, who relied on a doctor's report that plaintiff was doing "reasonably well" to find that the plaintiff was only slightly impaired.

---

[9]    Like Plaintiff here, the plaintiff in *Wildman* suffered from depression. *See Wildman*, 596 F.3d at 965–66.

259 F.3d 707, 712 (8th Cir. 2001). This Court finds *Hutsell* distinguishable from this

case. In *Hutsell*, the plaintiff had been hospitalized at least three times for psychotic

episodes that occurred unpredictably. *Id.* Though the plaintiff took several medications

daily, the Court found that the medication did not cure or alleviate the possibility that she

would decompensate or relapse. *Id.* No medical opinion supported the ALJ's finding that

the plaintiff was only slightly impaired, even though some doctors did conclude that the

plaintiff was doing relatively well considering her condition. *Id.* Here, there is no

evidence in the record to show that Plaintiff will be hospitalized or will relapse if she

takes medication consistently. In addition, as stated above, Plaintiff herself reported

"increased depression and anxiety while off her psychiatric medications." (Tr. 767.)

Plaintiff also testified that she takes care of her children, goes to school, does homework,

and completes some household chores. (Tr. 46–48.) Further, the medical opinions in the

record, including Dr. Benson's treatment notes, support the ALJ's finding that Plaintiff

has the RFC to perform a full range of work at all exertional levels with several

nonexertional limitations.[10] Thus, this Court finds that the ALJ did not rely too heavily on

---

[10]     The additional medical evidence in the record from other providers also fails to
support Dr. Benson's proposed limitations. Plaintiff's medical records indicate that she
sought postpartum care with general providers beginning in April 2010. While treatment
notes from her providers demonstrate consistent symptoms of depression, anxiety, grief,
and insomnia after April 2010, Plaintiff did not begin consistent therapy until January
2012. (Tr. 388, 394, 415, 421, 426, 493.) Between April 2010 and January 2012, Plaintiff
saw a psychiatrist twice. (Tr. 378, 499.) As a result, the majority of the medical records
during that time period are from Plaintiff's primary care providers and provide little
information regarding Plaintiff's mental health during the relevant time period.

14

areas of the record where Plaintiff was exhibiting less severe symptoms; instead, the evidence in the record as a whole supports the weight given to Dr. Benson's opinion.

Second, it was entirely proper for the ALJ to take into account Plaintiff's testimony that she had only seen Dr. Benson "four times a year on average." (Tr. 19.) As explained above, if the treating source's medical opinion is not afforded controlling weight, one of the factors, among others, to consider in determining the weight to give the opinion is the length of treatment and frequency of examination. *See* 20 C.F.R. § 404.1527(c)(2)–(6). The record reflects that Plaintiff saw Dr. Benson a total of six times before he provided his March 24, 2015 Medical Source Statement: June 10, 2013, September 16, 2013, December 20, 2013, January 13, 2014, May 24, 2014, and February 18, 2015. (Tr. 700–04, 720–23, 726–29, 730–33, 762–65, 766–70.) Approximately nine months passed between the fifth and the sixth visit. Considering the records and Plaintiff's testimony showing the frequency of her examinations with Dr. Benson is consistent with the directive provided in the regulations.

Third, the ALJ also properly considered the weight to provide Dr. Benson's opinion when it was "authored after the date last insured, and it does not specify how long he believes the claimant's symptoms have existed at that level of severity." (Tr. 19.) Dr. Benson prepared a "Hennepin County Mental Health Center Medical Source Statement" on March 24, 2015 (Tr. 771), approximately one year after Plaintiff's date last insured of March 31, 2014. The statement asks the preparer to rate the patient in multiple categories, which Dr. Benson did. (*Id.*) Dr. Benson also gave broad limitations to Plaintiff's ability to work. (Tr. 772–73.) He noted that Plaintiff was "very severely

15

limited" in her ability to complete routine tasks and to interact with coworkers, supervisors and the public. (*Id.*) And he concluded that Plaintiff's disorder causes more than a minimal limitation on her ability to do unskilled work. (Tr. 773.) As the ALJ pointed out, however, the form does not specify the applicable time frame for Dr. Benson's assessment. (Tr. 771.) Dr. Benson saw Plaintiff once in February 2015, but approximately nine months had passed between that visit and when Dr. Benson had seen her last. Thus, it is not clear from Dr. Benson's form that the assessments provided in March 2015 equally applied to Plaintiff during the relevant time period. The ALJ could properly assign reduced weight to Dr. Benson's opinion when he did not indicate whether his assessment was retroactive to the relevant period. *See Rich v. Comm'r of Soc. Sec. Admin.*, No. CV-16-00528-TUC-EJM, 2017 WL 4277181, at *22 (D. Ariz. Sept. 27, 2017) (concluding it was proper for the ALJ to reduce the weight given to a physician's opinion when the physician's assessment did not indicate whether it was retroactive to the relevant period); *Duke v. Soc. Sec. Admin.*, No. 3:15-0645, 2016 WL 4939363, at *5 (M.D. Tenn. Aug. 25, 2016) ("[T]he mere fact of prior treatment cannot support the retroactive application of Dr. West's 2012 opinion, when the opinion itself does not purport to apply to the prior period."). Furthermore, ALJs are entitled to give a medical opinion less weight if it contradicts the record and is written after the date last insured. *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (finding the ALJ was entitled to grant the doctor's opinion less deference because of inconsistencies and because it was written three years after plaintiff's benefits expired). In this case, Dr. Benson's opinion both

conflicts with the record and was written approximately one year after Plaintiff's date last insured.

In response to the Commissioner's argument that Dr. Benson's assessment was authored after the date last insured, Plaintiff correctly asserts that evidence of a disability subsequent to the date last insured can "support or elucidate the severity of the condition." *Pyland v. Apfel*, 149 F.3d 873, 878 (8th Cir. 1998). In this case, however, the subsequent evidence does not support Plaintiff's position. Plaintiff saw Dr. Benson twice between her date last insured and when he authored his opinion. In both visits, Plaintiff had stopped taking her medication, two weeks and over a month prior, respectively. (Tr. 762, 767.) The evidence subsequent to the date last insured only underscores the ALJ's observation that Dr. Benson's opinion did not take Plaintiff's noncompliance into account.

Therefore, based on the above reasons, the ALJ did not err in reducing the weight to be given to Dr. Benson's opinion; an assessment of no more than moderate weight is reasonable and supported by substantial evidence in the record.

## B. ALJ's Consideration of the State Agency Providers' Opinions

Two state agency psychological consultants completed assessments based on Plaintiff's medical records. Both Mary X. Sullivan, Ph.D., and R. Owen Nelsen, Ph.D., concluded that Plaintiff had mild difficulties in daily living activities and moderate difficulties in social functioning and maintaining concentration. (Tr. 81–83, 95–96.) They also found that she could handle normal supervision and the stress from a routine, repetitive work setting. (Tr. 81–82, 96.) Both noted, however, that Plaintiff's ability to

handle work stress and pressure would be reduced and that she could not work in a detailed or complex work-setting. (Tr. 83, 96.) The ALJ determined that the limitations included in the assessments were "generally consistent with the medical evidence of record" and therefore gave their assessments substantial weight. (Tr. 19.)

There is substantial evidence in the record to support the ALJ's decision to give the state agency consultants' assessments substantial weight. Both consultants based their assessments on Plaintiff's symptoms and providers' treatment notes. They noted that Plaintiff had moderate impairments for detailed or complex/technical instructions and tasks, which is supported by her providers' observations that Plaintiff had a depressed mood, concentration limitations, and limited judgment and insight. (Tr. 79, 83, 96.) Their findings that Plaintiff could adjust to other work, with limitations, are also consistent with the evidence on the record. Plaintiff attends school, takes care of her children, and does some household chores. (Tr. 46, 35, 47–48.) In addition, though she suffers from severe impairments, the record reflects that her symptoms improve with medication and consistent mental health treatment.

It is also worth noting that despite finding that Plaintiff could perform a full range of work, the ALJ and both state agency providers all determined that her work performance would have several nonexertional limitations. (Tr. 17, 83, 96.) The ALJ concluded that Plaintiff needs "simple, routine, and repetitive tasks consistent with unskilled work," "a work environment involving only occasional decision making, occasional changes in the work setting, and no strict quota requirements" with only occasional, brief, and superficial interactions with the public or co-workers, and

occasional interactions with supervisors. (Tr. 17.) These limitations align with Plaintiff's

severe impairments documented within the record.

Finally, Plaintiff argues that Dr. Sullivan "deceptively states that [Plaintiff],

'enjoys fishing, painting, and sewing'" without clarifying that Plaintiff no longer takes

part in those activities.[11] (Pl.'s Mem. 21.) This Court finds, however, that Dr. Sullivan's

mistake was a harmless error. Dr. Sullivan found Plaintiff's activities of daily living only

showed mild limitations; the ALJ, however, found them to be moderately limited, after

considering Plaintiff's testimony at the hearing. (Tr. 16.) And, the ALJ did not rely on the

discontinued hobbies of "fishing, painting and sewing" to support his decision. Thus,

Dr. Sullivan's omission of Plaintiff's lack of interest in hobbies she once enjoyed does

not appear to have influenced the ALJ's decision and is therefore not reversible error.

### C.  Question on Substantial Evidence in the Record as a Whole

In addition to the above, Plaintiff generally argues that the ALJ's decision as a

whole is not supported by substantial evidence. Based on the discussion above, this Court

---

[11]     In full, with respect to Plaintiff's functioning, Dr. Sullivan stated as follows:

[Plaintiff] lives with her children and fiancé. She takes care of her children
with the help of her fiancé. She engages in personal care but will sometimes
stay in her PJ's al[l] day if she [is] not going anywhere. She bathes as least
twice a week. She cooks full and quick meals for her family, some cleaning
and laundry. She uses public transportation when needing to go somewhere.
She shops, handles her own money[.] She enjoys fishing, painting, and
sewing. She socializes with her sister and some friends. She can walk a
couple blocks, follow instructions "pretty well" able to get along with
others "depending on the person[.]"

(Tr. 79.)

finds that there is substantial evidence in the record to support the ALJ's decision. Although this Court sympathizes with the hardship Plaintiff has endured, it recommends upholding the ALJ's decision to deny benefits. As the Eighth Circuit has made clear, "[i]f substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently." *Wildman*, 596 F.3d at 964.

### RECOMMENDATION

Based on the foregoing, and all the files, records, and submissions herein, **IT IS HEREBY RECCOMENDED** that:

1.    Plaintiff's motion for summary judgment (Doc. No. 14) be **DENIED**;

2.    Defendant's motion for summary judgment (Doc. No. 17) be **GRANTED**;

3.    Judgment be entered accordingly.


Date: January 12, 2018            *s/ Becky R. Thorson*_____
                                  BECKY R. THORSON
                                  United States Magistrate Judge


### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within **fourteen (14) days** after being served a copy" of the Report and Recommendation. A party may respond to those objections within **fourteen (14) days** after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement fourteen (14) days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) fourteen (14) days after the objections are filed; or (2) from the date a timely response is filed.